Chuck STONE et al., Appellants,

v.

**FEDERAL COMMUNICATIONS COMMISSION, Appellee.**

**The Evening Star Broadcasting Company, Intervenor.**

**No. 71–1166.**

United States Court of Appeals, District of Columbia Circuit.

Argued Feb. 25, 1972.

Decided June 30, 1972.

Rehearing Denied Sept. 1, 1972.

---

Mrs. Jean Camper Cahn, Washington, D. C., with whom Messrs. Joseph M. Beck, Washington, D. C., G. Dan Bowl-

ing, Arlington, Va., and John F. Banzhaf, III, Washington, D. C., were on the brief, for appellants.

Mr. Joseph A. Marino, Counsel, F.C.C., with whom Messrs. Richard E. Wiley, Gen. Counsel, F.C.C., John H. Conlin, Associate Gen. Counsel at the time the brief was filed, and Charles M. Firestone, Counsel, F.C.C., were on the brief, for appellee.

Mr. Howard F. Roycroft, Washington, D. C., with whom Messrs. Peter F. Rousselot and Marvin J. Diamond, Washington, D. C., were on the brief, for intervenor. Mr. William S. Reyner, Jr., Washington, D. C., also entered an appearance for intervenor.

Before BAZELON, Chief Judge, WILKEY, Circuit Judge, and MATTHEWS,* U. S. Senior District Judge for the District of Columbia.

WILKEY, Circuit Judge:

The essential issue raised by this appeal is whether the Federal Communications Commission could reasonably find that the plaintiffs had not raised substantial and material questions of fact which would show *prima facie* that Commission renewal of WMAL-TV's license would not serve the public interest. For the reasons stated hereafter, we hold that the Commission could so find, and therefore affirm the Commission's approval of WMAL-TV's license renewal application and dismissal of the plaintiffs' Petition to Deny the Renewal Application for a Television License.[1]

I. *Background*

Plaintiffs, sixteen Washington, D. C., community leaders,[2] challenge the Com-

mission's dismissal of their Petition to Deny the Renewal Application for a Television License, filed with the FCC 2 September 1969, and grant of the renewal application of the licensee-intervenor, the Evening Star Broadcasting Company, for a regular three-year term from 1 October 1969 to 1 October 1972.[3] In their Petition to Deny plaintiffs requested the Commission to refuse the licensee-intervenor's renewal request on the following grounds:

(1) That the licensee-intervenor's station WMAL-TV did not adequately survey the black community in its efforts to ascertain the needs of the Washington, D. C., area;

(2) That it misrepresented facts to the Commission;

(3) That its programming did not serve the public interest, specifically in that it did not meet the needs of the Washington, D. C., black community;

(4) That its employment practices were discriminatory against blacks; and

(5) That renewal of its license would lead to excessive concentration in the Washington, D. C., communications media.

On receiving this Petition to Deny, the Commission delayed renewal of WMAL-TV's license until it had decided whether to hold a hearing on WMAL-TV's application. This in turn depended on whether substantial and material questions of fact were present and whether plaintiffs had made a *prima facie* case for denial of the license.[4]

The licensee-intervenor filed an Opposition to the Petition to Deny[5] with the Commission 3 October 1969, seeking to rebut plaintiffs' contentions. Plain-

---

* Sitting by designation pursuant to 28 U.S. C. § 294(c) (1970).

1. Appendix, pp. 266–499.

2. The plaintiffs are Chuck Stone, Julius W. Hobson, Charles I. Cassell, Isaac Long, Kenneth C. Kennedy, John M. Thornton, Etta M. Horn, Douglas Moore, Channing E. Phillips, Roena J. Rand, Julius Mack, Willie P. Hardy, William D. Wright, Calvin W. Rolack, Marion Barry,

Jr., and Walter E. Fauntroy, as individuals and as representatives of certain organizations listed in Brief for Appellants, p. 3.

3. Evening Star Broadcasting Company, 27 F.C.C.2d 316 (1971).

4. As required by 47 U.S.C. § 309(d) (1), as amended 1960.

5. Appendix, pp. 500–679.

tiffs filed a Reply [6] to the licensee's Opposition, responding to the licensee's arguments. While the FCC was considering these issues, the licensee amended its renewal application [7] to include a new survey of the needs of the residents of Washington, D. C., and the surrounding area. Plaintiffs responded with a Motion to Strike and Remove the amendment from consideration by the Commission. This motion was denied by the FCC 14 August 1970 [8] on the grounds that any application can be amended as a matter of right prior to its designation for hearing, and that the Commission's rules require applicants to amend in the event of significant changes in the information contained in their applications. The Commission also refused to strike material in the licensee's amendment pertaining to events transpiring after 30 September 1969, the expiration date of WMAL-TV's previous license, but permitted plaintiffs to sift through this material to specify precisely what they did not want the Commission to consider. Plaintiffs filed these comments 4 September 1970, and the licensee answered a week later.

On 3 February 1971 the Commission issued its decision which forms the basis for this appeal, finding no remaining substantial or material questions of fact and granting WMAL-TV's license renewal request.[9] The FCC specifically stated:

(1) That, taking into account the licensee's amendment as well as the original application, it found the licensee's survey met the Commission's ascertainment requirements;

(2) That the record demonstrated that the licensee had not intentionally misrepresented facts submitted to the Commission concerning contacts between the licensee and certain Washington, D. C., community leaders;

(3) That plaintiffs had failed to make a *prima facie* case that WMAL-TV was unresponsive to community, especially black community, needs, since the station's programming came within the discretion afforded licensees with respect to program content;

(4) That grant of the renewal application would not result in excessive concentration in the communications media and that, in any event, this was a subject for rulemaking, then under progress; and

(5) That no substantial question of fact remained with respect to the licensee's uncontroverted employment statistics and that plaintiffs had not made a *prima facie* showing of discriminatory employment practices on the part of the licensee.

Plaintiffs thereupon brought this appeal.

## II. *Standards for Judicial Review*

It is important at the outset to delineate the standards under which the FCC operates, which thereby become the focal point for our review of the agency's decision.

The standards applicable to FCC conduct with respect to broadcast license applications are contained in Section 309 (d) of the Communications Act of 1934.[10] Section 309(d) provides for granting such applications where the Commission finds, after full consideration of all pleadings submitted, that there "are no substantial and material questions of fact and that a grant of the application would be consistent with [the public interest]." In those instances where a petition to deny such an application is filed by a party, it must "contain specific allegations of fact sufficient to show . . . that a grant of the application would be *prima facie*

---

6. *Id.*, at 680–825.

7. *Id.*, at 826–907, pursuant to the Commission's Rules, 47 C.F.R. §§ 1.65, 1.522.

8. Evening Star Broadcasting Company, 24 F.C.C.2d 735 (1970).

9. *See* note 3, *supra.*

10. 47 U.S.C. § 309(d), as amended 1960.

inconsistent with [the public interest]."[11] Where the Commission finds that such a showing has not been made, it may refuse the petition to deny on the basis of "a concise statement of the reasons for denying the petition, which statement shall dispose of all substantial issues raised by this petition."[12]

■■ The legislative history accompanying the 1960 amendment of Section 309(d) indicates Congress' intent that petitions to deny filed under the amended Section 309(d) should make

a substantially stronger showing of greater probative value than is now necessary in the case of a post grant [of initial license] protest. The allegation of ultimate, conclusionary facts or more general allegations on information and belief, supported by general affidavits, as is now possible with protests, are not sufficient.[13]

In the event, then, that a petition to deny does not make substantial and specific allegations of fact which, if true, would indicate that a grant of the application would be *prima facie* inconsistent with

the public interest, the petition may be denied without hearing on the basis of a concise statement of the Commission's reasons for denial. While this court in West Michigan Telecasters, Inc. v. FCC remanded a decision of the Commission in order that the FCC might either state with particularity the reasons for its grant of a broadcast application or hold a hearing, we recognized:

Admittedly, the scope of our review is quite narrow; we defer to the expertise and experience of the Commission within its field of specialty and would reverse only where the Commission's position is arbitrary, capricious or unreasonable . . . [a]nd it is clear that the decision of when hearings are necessary or desirable to clarify issues is one which lies in the first instance with the Commission.[14]

■■ Aside from the sufficiency of a petition to deny, the FCC is not required to hold a hearing where it finds, on the basis of the application and other pleadings submitted, no substantial and material questions of fact to exist and

---

11. *Id.*, at § 309(d) (1).

12. *Id.*, at § 309(d) (2).

13. S.Rep. No. 690, 86th Cong., 1st Sess. 3 (1959). *See also* H.Rep. No. 1800, 86th Cong., 2d Sess. 12 (1960). The protest after initial grant of license referred to above was that provided for in then Section 309(c), which required "merely an articulated statement of some fact or situation which would tend to show, if established at a hearing, that the grant of the license contravened public interest, convenience and necessity, or that the licensee was technically or financially unqualified, contrary to the Commission's initial finding." Federal Broadcasting System v. FCC, 96 U.S.App.D.C. 260, 263, 225 F.2d 560, 563, cert. denied, WHEC Inc. v. Federal Broadcasting System, 350 U.S. 923, 76 S.Ct. 212, 100 L.Ed. 808 (1955).

14. 130 U.S.App.D.C. 39, 42, 396 F.2d 688, 691 (1968). *See also* Southwestern Operating Co. v. FCC, 122 U.S.App.D.C. 137, 138, 351 F.2d 834, 835 (1965), where this court expressed "no doubt that Congress intended to vest in the FCC a large discretion to avoid time-consuming hearings in this field whenever possible,

and we would ordinarily defer to that purpose."

Furthermore, plaintiff's reliance on Office of Communication of United Church of Christ v. FCC, 123 U.S.App.D.C. 328, 359 F.2d 994 (1966), is misplaced. In the first place, there is no dispute in the case at bar as to plaintiffs' standing to challenge WMAL–TV's license renewal application. More importantly, plaintiffs' allegations lack the specificity which characterized those in *United Church of Christ*: There is no evidence presented from any monitored week, nor a long history of complaints requesting a certain type programming. There is no pattern of facts presented which points to the existence on the part of WMAL–TV of a policy of racial discrimination. In addition, in contrast to *United Church of Christ*, the FCC has not granted WMAL–TV merely a short-term renewal of its license while finding that the facts before it would not justify a determination that the public interest would be served by approving full renewal. Instead, the Commission has here found that full renewal of WMAL–TV's license would be in the public interest.

that granting the application would serve the public interest.[15] Nor is a hearing required to resolve undisputed facts.[16] And, where the facts required to resolve a question are not disputed and the "disposition of [an appellant's] claims [turn] not on determination of facts but inferences to be drawn from facts already known and the legal conclusions to be drawn from those facts," the Commission need not hold a hearing.[17] Finally, a hearing is not required to resolve issues which the Commission finds are either not "substantial" or "material," regardless of whether the facts involved are in dispute.[18]

We now turn to plaintiffs' specific objections, in order to determine whether the Commission was correct in dismissing plaintiffs' Petition to Deny and granting WMAL-TV's license renewal application without a hearing.

## III. *Plaintiffs' Specific Objections*

### A. *WMAL-TV's Ascertainment Efforts*

It is important to recognize the sequence of events pertaining to WMAL-TV's efforts to ascertain community needs and interests, before determining whether any substantial and material questions of fact were raised as to the adequacy of those efforts. On 7 August 1969 WMAL-TV filed its application for renewal of its broadcast license; on 2 September 1969 plaintiffs filed their Petition to Deny. In December 1969 a Notice of Inquiry was issued by the Commission proposing a primer on the ascertainment of community needs by broadcast applicants.[19] The FCC stated that this primer was intended to clarify the Commission's requirements regarding ascertainment and that applicants whose ascertainment showings were deficient under the interim guidelines set forth in the Notice of Inquiry "can amend as a matter of right prior to designation for hearing."[20] On 12 May 1970 WMAL-TV amended Part I, Section IV–B of its renewal application, which deals with ascertainment of community needs.

Plaintiffs challenge the adequacy of WMAL-TV's ascertainment efforts on three grounds: (1) that WMAL-TV's initial ascertainment efforts, as reflected in their application for renewal filed 7 August 1969, failed to meet the required standards of representativeness; (2) that the FCC's admission and use of WMAL-TV's "amendment" filed 12 May 1970 was improper in view of prior Commission and judicial practice; and (3) that the ascertainment efforts reported in this "amendment" failed to comply with Commission requirements.

It may be true that WMAL-TV's initial ascertainment procedures failed to meet the required standards of representativeness.[21] This initial fail-

---

15. *See* note 12, *supra.*

16. *See* Marsh v. FCC, 140 U.S.App.D.C. 384, 387–388, 436 F.2d 132, 135–136 (1970), where we noted "Only where the public interest cannot be determined without a resolution of disputed facts has Congress dictated that the Commission must conduct a hearing."

17. Anti-Defamation League v. FCC, 131 U.S.App.D.C. 146, 148, 403 F.2d 169, 171 (1968).

18. *See* 47 U.S.C. § 309(d)(2), (e), as amended 1960. The legislative history provides a definition of "material question of fact":

> For the purposes of sections 309(d) and (e) a "material question of fact" is a question of fact which is material to determination of the question wheth-
> er the public interest, convenience, or necessity would be served by the granting of the application with respect to which such question is raised.

H.Rep.No. 1800, 86th Cong., 2d Sess. 12 (1960) U.S.Code Cong. & Admin.News, p. 3520.

19. 20 F.C.C.2d 880 (1969). The Commission subsequently adopted in final form this proposed *Primer*—entitled Primer on Ascertainment of Community Problems—with only minor modifications from the proposed version. 27 F.C.C.2d 650 (1971).

20. 20 F.C.C.2d 880, para. 4 (1969).

21. There is good reason to believe that WMAL–TV's initial ascertainment efforts were halfhearted and in violation of FCC decisions that were later codified

ure, however, is not dispositive of the case. If the FCC's admission and use of the "amendment" is found to be proper, it is not enough for the plaintiffs to establish the existence of substantial and material questions of fact regarding the first ascertainment. If the amendment is permitted, the plaintiffs must show instead that even after the amendment a substantial and material question of fact still existed.

■ With respect to the second objection, plaintiffs assert first that WMAL-TV's "amendment" was actually a supplemental pleading whose admissibility was barred by the FCC's Rules [22] and, second, that Commission acceptance of the "amendment" violated its own policy against "upgrading." As for the first ground, that WMAL-TV's "amendment" qualified as a supplemental pleading and should have been barred in the absence of FCC approval of its being filed as such, plaintiffs' assertion overlooks the fact that the Commission was not required to make such a determination. Section 1.522(a) of the Commission's Rules states that "any application

may be amended *as a matter of right* prior to the adoption date of an order designating such application for hearing . . . ." and that "[i]f a petition to deny . . . has been filed, the amendment shall be served on the petitioner." [23]

Clearly then, Section 1.522(a) is intended to apply to an application against which a petition to deny has been filed. And, as the Commission indicated in its Notice of Inquiry proposing a new primer on the ascertainment of community needs by broadcast applicants, "[a]pplicants whose showings [with respect to ascertainment] are deficient can amend as a matter of right prior to designation for hearing. . . ." [24] When the FCC subsequently adopted the final version of its Primer on Ascertainment of Community Problems by Broadcast Applicants, it specifically permitted applicants in hearing to amend their applications " . . . if deemed necessary in view of our action here. . . ." [25] Prior and subsequent Commission practice accords with this interpretation.[26] The Commission has even

in Primer on Ascertainment of Community Problems, 27 F.C.C.2d 650 (1971). These decisions required that community leaders and members be systematically contacted in a context apart from the normal marketing and news-gathering functions of the stations.

In this case the plaintiffs' Petition to Deny may have prodded the licensee into substantial compliance with the FCC's ascertainment procedures. Such remedial action is one of the benefits produced by the process of public participation approved by this court in Office of Communication of United Church of Christ v. FCC, 123 U.S.App.D.C. 328, 359 F.2d 994 (1966).

22. Plaintiffs cite 47 C.F.R. § 1.45, which provides in relevant part that "No additional pleadings may be filed unless specifically requested by the Commission or authorized by it." § 1.45(c). The Commission did not here specifically request such pleadings or authorize their filing.

23. (Emphasis supplied) 47 C.F.R. § 1.522 (a), which provides:
§ 1.522 *Amendment of applications*
(a) Subject to the provisions of §§ 1.525 and 1.580, any application may

be amended as a matter of right prior to the adoption date of an order designating such application for hearing, merely by filing the appropriate number of copies of the amendments in question duly executed in accordance with § 1.513. If a petition to deny (or to designate for hearing) has been filed, the amendment shall be served on the petitioner. See § 1.571(j) for the effect of certain amendments to standard broadcast applications.

24. *See* note 20, *supra.*

25. *See* note 19, *supra,* 27 F.C.C.2d 650, 680 (1971).

26. The Commission rejected a similar objection to an applicant's amendment of its ascertainment showings subsequent to the filing of a petition to deny but before a hearing, in Andy Valley Broadcasting System, Inc., 12 F.C.C.2d 3 (1968). The Commission there stated:
Petitioners further contend that the amendments submitted by the applicant should, in fact, be considered as unauthorized additional pleadings prohibited by Section 1.45(c) of the Commission's rules. We find no merit in this conten-

requested this court to remand several cases in which the applicants were contesting adverse FCC decisions regarding ascertainment showings, in order to afford those applicants an opportunity to amend their community surveys.[27]

As for plaintiffs' assertion that Commission acceptance of WMAL-TV's amendment violated its own policy against "upgrading," the FCC's policy against last-minute upgrading pertains to programming performance, not ascertainment. The ascertainment of community needs and interests is prospective in orientation; it is directed at proposals for future programming, not past programming.[28] There is thus a reasonable distinction between allowing last-minute upgrading of ascertainment performance, as opposed to last-minute improvements in programming; the Commission's rule in favor of amendments to ascertainment findings works no harm to the public interest.

Plaintiffs' third objection—that WMAL-TV's ascertainment efforts as amended failed to comply with Commission requirements—relates both to the content and manner of WMAL-TV's ascertainment efforts. As for the former, plaintiffs emphasize WMAL-TV's obligation to serve the needs and interests of the community of license, primarily in their view Washington, D. C., and secondarily the surrounding communities within WMAL-TV's Grade A contour. While the proper obligation in this respect is treated in detail *infra*, it is not necessary to reach it here, as it is clear that WMAL-TV did in fact primarily survey Washington, D. C. Of 104 community leaders contacted in the amended survey by the Evening Star Broadcasting Company, 49 represented the District of Columbia, 34 nearby Maryland counties, and 21 nearby Virginia counties. These figures reflect each area's percentage of the metropolitan area population, except for Washington, D. C. As the Commission noted, "Since Washington, D. C., is WMAL-TV's city of license, WMAL-TV doubled the number . . . of community leaders to be interviewed in Washington." [29]

As for plaintiffs' other objections with respect to the content of WMAL-TV's ascertainment efforts, none raise substantial and material questions of fact making a *prima facie* case for FCC denial of WMAL-TV's license renewal application. The combination of the scientific statistical survey of Washington area residents, the Fisher survey (focusing on interviews with inner city

tion. Under Section 1.522(a) amendments of this type may be filed as a matter of right prior to designation of the application for hearing. Furthermore, where the information would be of decisional significance, Section 1.65 makes an amendment mandatory. We have always encouraged ameliorative nonengineering amendments at the prehearing stage, and we can find no reason to change our practice in this regard even though the amendment might have the effect of vitiating a valid objection raised in a petition to deny. *Id.*, at 4.

*See also* North American Broadcasting Co., 29 F.C.C.2d 69 (1971); Rizner Broadcasting, Inc., 28 F.C.C.2d 330 (1971), overruling Mace Broadcasting Co., 21 F.C.C.2d 605 (1970), which had required that an applicant desiring to amend its ascertainment showings must first demonstrate that its original showings met pre-1969 standards.

27. Middle Georgia Broadcasting Co. v. FCC, (No. 24,426, remanded 9 March 1971); Darby v. FCC, (No. 24,291, remanded 9 March 1971); and Roach v. FCC, (No. 23,719, remanded 22 March 1971).

28. As such, the case at bar differs from the situation presented in Office of Communication of United Church of Christ v. FCC, 123 U.S.App.D.C. 328, 359 F.2d 994 (1966), where the licensee tried to upgrade at the last moment an unsatisfactory prior record. Here, in contrast, WMAL-TV has filed more complete and current information, regarding a section of its license renewal application, directed at its qualifications to broadcast in the public interest for the license period applied for.

29. *See* note 7, *supra*, at 838.

residents) and the emphasis placed by WMAL-TV on interviewing Washington, D. C., community leaders—in relation to population nearly double the number (49) of those interviewed from suburban Maryland (34) and Virginia (21) —demonstrate that plaintiffs' objections are unavailing in this regard.

 With respect to the methods employed by WMAL-TV to fulfill its ascertainment obligations, plaintiffs complain first of WMAL-TV's use of pre-printed forms for consulting both community leaders and the general public. However, this neglects the fact that the questionnaires were used in lieu of, but in conjunction with, personal interviews, as a means of compiling and digesting the variety of information collected. The FCC's *Primer*, as finally adopted, provides that "[a] questionnaire [or pre-printed form] may serve as a useful guide for consultations with community leaders, but cannot be used in lieu of personal consultations." [30] Furthermore, it was permissible, indeed desirable, to use the same forms to summarize interviews with the general public as well as with community leaders.[31] While the purpose of consulting members of the general public is "to further ascertain community problems which may not have been revealed by consultations with community leaders," [32] a random sample of

the general public is sufficient to meet this requirement [33] and the use of different forms is not required. In addition, both the proposed and final *Primers* also state that it is not necessary that the information elicited from a community leader be set forth after his name, but simply that "the information can be set forth in a general list of community problems." [34]

### B. *WMAL-TV's Alleged Misrepresentation of Fact*

 Plaintiffs allege that WMAL-TV misrepresented the extent of its contact with black Washington, D. C., community leaders in regard to the station's ascertainment of community needs. In Exhibit C of its original application, WMAL-TV used the words "close personal association" and "daily and continuing activity" to describe this contact.[35] Plaintiffs submitted affidavits from eight of the leaders listed in Exhibit C to the effect that WMAL-TV did not maintain "close personal associations" with *each* of them individually on a *daily or continuing* basis. WMAL-TV responded to these allegations by presenting affidavits from its staff members detailing their contacts with these and community leaders in general.

30. *See* note 19, *supra*, 27 F.C.C.2d 650, 685, Q. 17 (1971).

31. *Id.*, at 684, Q. 13(b).

32. *Id.*

33. *Id.*, at 666–667.

34. *See* note 19, *supra*, 20 F.C.C.2d 880, 884, Q. 22 (1969) ; 27 F.C.C.2d 650, 685, Q. 21 (1971). As the latter notes, "[T]here are instances where those consulted will speak more candidly if their comments are not attributed to them in a document open to public inspection." 27 F.C.C.2d, at 671, para. 53.

35. The pertinent portion of Exhibit C, in which WMAL-TV describes in detail the procedures used to ascertain community needs and interests, provides as follows :
 [D]irect consultation with community leaders by the licensee's management

personnel is important to our ascertainment process. The licensee maintains *close personal association* with federal state, and local officials, civic leaders, and representatives of religious, business, educational, and cultural organizations. Station executives, the news staff, the editorial director, the public affairs staff, and air personalities communicate with these community leaders throughout the year in order to broaden our understanding of the needs of our community. The associations WMAL–TV personnel maintain with the individuals and organizations listed here represent a *daily and continuing activity* and result from active and regular participation in their civic and charitable efforts. (Appendix, pp. 31–32 (emphasis supplied).)

The Commission concluded on the basis of these statements that the use of the words "close personal association" and "daily and continuing activity" did not raise a substantial question of a deliberate attempt on the part of WMAL-TV to deceive the Commission. In the context of the application as a whole and on the basis of the affidavits submitted by WMAL-TV in its Opposition,[36] the FCC concluded that the station's contact with Washington, D. C., community leaders, including black community leaders, was sufficiently regular to qualify as "continuing." Nor was it reasonable to interpret the word "daily" as meaning that the licensee claimed to keep contact *daily* with *each* of the community leaders. While use of these words was perhaps careless on the part of WMAL-TV, the only issue is whether the licensee intended to mislead the FCC. It was well within the discretion of the Commission to decide that there was no intent on the part of the station to deceive. As this court has stated on this very point:

> [Q]uestions respecting misrepresentations of fact are, perforce, fact questions peculiarly within the province of the Commission to consider. As long as the Commission is cognizant of the issue raised and, upon the record, reasonably resolves that issue on behalf of an applicant, this court will not, and cannot, set that determination aside.[37]

## C. *Responsiveness of WMAL-TV's Programming*

The determination of whether WMAL-TV's programming raises a substantial and material question of fact with respect to its responsiveness to community needs and interests requires first delineating the station's service area obligations. In the situation presented by the case at bar, WMAL-TV's service area consists of its city of license, Washington, D. C., and the surrounding areas of Maryland and Virginia. While plaintiffs argue that WMAL-TV has a primary obligation to serve the needs and interests of its city of license, with its 70% black population, and that the station's programming should therefore be commensurate with this figure, it is not necessary for us to resolve this issue. In the first place, the Commission in the case at bar recognized ". . . the fact that the problems of most cities are particularly complex and pressing and require great efforts on the part of the licensee to fulfill its responsibilities." [38]

The FCC further stated:

> Petitioners assert . . . that the special problems of the District of Columbia (problems enumerated in the Petition to Deny) give rise to a need for specific programming designed to meet the needs and interests of the community. With this contention there is no dispute, but we are of the opinion that the licensee has, by the programming noted in the foregoing paragraphs and in its Opposition, clearly shown that it has broadcast numerous programs which are of particular interest to the District of Columbia's majority Black population.[39]

In the second place, it is clear that a broadcast licensee has an obligation to meet the needs and interests of its entire area of service.[40] This is particularly the case with respect to television stations, in view of the limited number of stations. Suburban and other outlying area are not cities of license, al-

---

36. *See* note 5, *supra.*

37. WEBR v. FCC, 136 U.S.App.D.C. 316, 322, 420 F.2d 158, 164 (1969).

38. *See* note 3, *supra,* 27 F.C.C.2d, at 321, n. 4.

39. *Id.,* at 332.

40. Petersburg Television Corp., 19 F.C.C. 451, recon. denied, 10 Pike & Fischer, R.R. 584, aff'd sub nom., Southside Virginia Telecasting Corp. v. FCC, 97 U.S. App.D.C. 130, 228 F.2d 644, cert. denied, 350 U.S. 1001, 76 S.Ct. 546, 100 L.Ed. 865 (1956) ; and Huntington Broadcasting Co., 14 F.C.C. 563, aff'd sub nom., Huntington Broadcasting Co. v. FCC, 89 U.S.App.D.C. 222, 192 F.2d 33 (1951).

though their needs and interests must be met by television stations licensed to central cities.

 How a broadcast licensee responds to what may be conflicting and competing needs of regional or minority groups remains largely within its discretion. It may not flatly ignore a strongly expressed need; on the other hand, there is no requirement that a station devote twenty percent of its broadcast time to meet the need expressed by twenty percent of its viewing public. Until this problem is addressed in a rule-making procedure, the scope of FCC review remains whether or not the licensee has reasonably exercised its discretion.

The Commission, after considering plaintiffs' objections in regard to the alleged lack of WMAL-TV responsiveness to community, particularly black community, needs and interests, found that they did not raise questions of fact of such a material and substantial nature to require a hearing. What the Commission found to be in dispute were not the facts, but rather the conclusions to be drawn as to whether the renewal of WMAL-TV's license would be contrary

to the public interests. For example, in the record there is a one-month sample news program of WMAL-TV,[41] which arguably shows a concentration on the District of Columbia proper. The Commission found that this programming was responsive to community needs. There was no challenge to the fact that these programs were broadcast. The plaintiffs made the argument before the FCC that this programming was inadequate, and this argument was rejected. We fail to see that a full-scale hearing would have added anything for either the Commission or this court to consider.

 The Commission found, and we agree, that plaintiffs' objections here lack the requisite specificity.[42] They are largely conclusory and in most instances are not tied to specific programming deficiencies. Where they are so tied, they fail to indicate whether non-blacks are accorded different, more positive treatment.[43] For plaintiffs simply to object to the quality of WMAL-TV's programming in general and conclusory terms offers the Commission little assistance in terms of the guidelines which it requires to implement policy changes.[44] Furthermore, such generalized criti-

41. *See* Application for Renewal of Broadcast License, 19–31 (26 June 1969), concerning highlights of WMAL-TV's news calendar during April 1969. *See also* Opposition to the Petition to Deny, note 5, *supra,* at 605–615, for a summary of programming by WMAL-TV for the years 1967, 1968, and 1969 directed to the needs and interests of the black community.

42. *See* note 11 and accompanying text, *supra.*

43. *See, e. g.,* Reply Brief for Appellants, p. 26, n. 50. Plaintiffs did not indicate that the non-black participants on the television programs listed—"NYPD," "Mod Squad," and "The Outcasts"—are accorded different, more positive treatment.

44. One reason plaintiffs' objections are lacking in specificity may be that the needs which are allegedly not being met were never explored during the ascertainment process. Many of plaintiffs' objections centered around the station's failure to deal with the black culture with sensi-

tivity and sympathy. The FCC's ascertainment procedures speak largely in terms of ascertaining and dealing with community "problems." Community life, however, does not consist entirely of problems. Rather, it includes a spectrum of events and interests that range from newsworthy to purely aesthetic. It might be desirable for ascertainment proceedings to inquire into more than the problems or newsworthy events in a community. Such proceedings might be directed toward obtaining an awareness of the broad range of human activity that includes family life, art, and social interaction. These non-problem areas of interest are often much more important in both everyday life and in media programming than the problems of a community. It is not unreasonable for a cultural group to wish these elements of their existence to be treated with seriousness and sensitivity. Providing an avenue for ascertaining community needs and interests in these non-problem areas could be extremely difficult. The FCC, however, in its rule-making capacity is clearly the proper for-

cisms run the risk of turning the FCC into a censorship board, a goal clearly not in the public interest. Of course, there must exist in this area a delicate balance between the maintenance of a free competitive broadcast system and reasonable restrictions on such freedom in the public interest, in view of the scarcity of airwaves for broadcasting. In the absence of a competing broadcast application situation, where a hearing is required,[45] plaintiffs bear a substantial burden of specificity, a burden they have not met in the case at bar. The Commission's interpretation of its policies not being arbitrary or unsupported by substantial evidence, must be permitted to stand.

■ Plaintiffs' specific objections as to the number of blacks who have appeared on WMAL-TV religious programming are not borne out in view of the following: First, of the 55 needs and problems suggested by 104 community leaders in WMAL-TV's amended ascertainment showings, and of the 21 needs suggested by the random sampling of 200 private citizens, none related to religious programming. At least some doubt is thus shed on plaintiffs' conclusory statements as to the relative importance of religion for members of the black community.

Secondly, a number of black clergymen and laymen did in fact participate in WMAL-TV's religious programming, as well as in a wide variety of other public affairs programming. This participation was of a sufficiently high order to remove the FCC's findings from the category of arbitrary or capricious.[46]

A more fundamental objection made by plaintiffs—to the quality of television programming in general, both with respect to black and all citizens' needs and interests—is more suitable for rulemaking, where all viewpoints may be aired.[47]

D. *WMAL-TV's Employment Policies and Practices*

■ As the figures with respect to minority group employment submitted by WMAL-TV in its Opposition to the Petition to Deny [48] were not controverted by plaintiffs and no specific instances of refusal by WMAL-TV to hire on racial grounds were alleged, the sole question before the Commission in this regard was whether the aggregate picture presented by WMAL-TV's employment policies and practices made a *prima facie* case for refusing to renew the station's license. Under Section 73.680 of the Commission's Rules, television licensees are prohibited from discriminating on the basis of, *inter alia*, race in employment policies and practices.[49] However, as the Commission noted in an earlier case, "Simply indicating the number of Blacks employed by the licensee, without citing instances of discrimination or

um for posing objections to the quality and nature of media programming. Until there is a redefinition of the scope of the ascertainment process, we are bound to evaluate a programmer's procedures in light of what is currently required.

45. Had plaintiffs filed a competing application for the Channel 7 frequency in Washington, D.C., a hearing on the respective applications would be required. Citizens Communications Center v. FCC, 145 U.S.App.D.C. 32, 447 F.2d 1201 (1971). In addition, the overall programming proposals could be compared in the Commission's evaluation of which applicant would better serve the public interest. In the context of the case at bar, however, plaintiffs have the burden under 47 U.S.C. § 309(d) (1), see note

12 and accompanying text, *supra*, of demonstrating specifically a substantial issue or issues with respect to WMAL-TV's alleged inability to serve the public interest.

46. *Cf.* City of Camden, 18 F.C.C.2d 412 (1969), with its inadequate survey and news reduction proposal.

47. In this regard, *see* Violence on Television, 25 F.C.C.2d 830 (1970), the Commission's decision to await the Surgeon General's report on the effect of broadcasts containing violence, before evaluating proposals to limit such programming by rules or regulations.

48. *See* note 5, *supra.*

49. 47 C.F.R. § 73.680.

**330**

describing a conscious policy of exclusion, is not sufficient to require an evidentiary exploration." [50]

In that case, as in the one at bar, the affidavits of the licensee regarding recruitment of minority group members and their placement in a variety of positions, not simply menial jobs, were sufficient to rebut any allegations of discrimination in that respect.[51]

### E. Concentration in the Washington Area Communications Media

■■ While plaintiffs allege no specific abuses resulting from the fact that the Evening Star Broadcasting Company, the licensee of WMAL-TV, also owns two radio stations in Washington, D. C., and is in turn owned by the publishers of *The Evening Star*, one of the city's daily newspapers, they contend that these facts in themselves warrant a hearing on the question of undue concentration in the communications media.

Commission renewal of WMAL-TV's broadcast license, initially awarded in 1946, is in accord with its present multiple ownership rules.[52] These rules do provide that the facts of each case are to be considered in terms of the number of people served and the extent of competition, in order to determine whether there is a concentration detrimental to the public interest. This has been interpreted by the FCC to mean that hearings are appropriate where specific abuses are alleged to have resulted from the nature of the ownership structure.[53]

In the absence of allegations of specific abuses arising from the Evening Star Broadcasting Company's ownership of WMAL-TV, and since the situation presented by the case at bar falls within the scope of the Commission's present multiple ownership rules, concentration of ownership of the communications media is not a proper basis for disapproving a license renewal request.[54]

50. WTAR Radio-TV Corp., 19 Pike & Fischer, R.R.2d 661, 686 (Review Board 1970).

51. In Exhibit 9 of its Opposition to the Petition to Deny, see note 5, *supra*, WMAL-TV lists 24 full-time employees who are minority group members (22 of whom are black) and 2 part-time minority group employees. The station also indicated in its 1969 Equal Employment Opportunity Report that as of 27 May 1969 it had 18 minority group employees (of whom 16 were black) ; of these 18, three were professionals, three technicians, five office and clerical workers and one a white collar trainee. The license indicated that since that Report, it had hired six more black employees.

These figures in WMAL-TV's Opposition were not controverted by plaintiffs. WMAL-TV in addition submitted its statement of equal employment opportunities. Appendix, pp. 572-576.

52. 47 C.F.R. §§ 73.35, 73.240, and 73.636. These rules were initially adopted in 1953, Multiple Ownership of AM, FM and TV Stations, 18 F.C.C. 288 (1953), and sustained in United States v. Storer Broadcasting Co., 351 U.S. 192 (1956). They have been amended several times since then ; as of the time of plaintiffs' filing their Petition to Deny, see note 1, *supra*, the FCC's Rules provided that a licensee could own other broadcast interests in

the same area if they were in different services (i. e., AM, FM, TV). The most recent amendment of these rules prohibits "common ownership, operation or control of more than one unlimited-time broadcast station in the same area, regardless of the type of broadcast service involved." First Report and Order, Multiple Ownership of Standard, FM & TV Broadcast Stations, 22 F.C.C.2d 306 (1970). Simultaneously the Commission exempted existing AM, FM, and TV combinations, partly because of the disruptive effects of requiring divestiture at that time. *Id.*, at 323. Also at the same time the Commission issued a Further Notice of Proposed Rulemaking, Multiple Ownership of Standard, FM & TV Broadcast Stations, 22 F.C.C.2d 339 (1970), in order to consider whether it would be in the public interest to require divestiture by newspapers or multiple owners in a given market. This rulemaking proceeding is still outstanding.

53. *See, e. g.,* Midwest Radio-Television, Inc., 16 F.C.C.2d 943, 17 F.C.C.2d 290 (1969) ; and Chronicle Broadcasting Co., 16 F.C.C.2d 882, 17 F.C.C.2d 245 (1969).

54. While such concentration may be a relevant consideration in comparative proceedings, Citizens Communications Center v. FCC, *see* note 45, *supra*, and McClatchy Broadcasting Co. v. FCC, 99 U.S. App.D.C. 195, 239 F.2d 15 (1956), mul-

What plaintiffs are actually challenging is the wisdom of the Commission's multiple ownership rules. However, as noted above, the FCC is currently investigating—in the context of a rule-making proceeding—whether it should adopt rules which would require divestiture by newspapers or other multiple owners in a given market.[55] And, as this court has stated, rulemaking proceedings are the most appropriate forum for Commission consideration of basic changes in policy.[56]

## IV. *Conclusion*

For the reasons discussed above, the action of the Commission approving WMAL-TV's license renewal application and dismissing plaintiffs' Petition to Deny is accordingly

Affirmed.

## ON APPELLANTS' PETITION FOR REHEARING

### ORDER

On consideration of appellants' petition for rehearing, it is

Ordered by the Court that appellants' aforesaid petition is denied.

## PER CURIAM:

Petitioners, sixteen Washington area community leaders, ask this panel to re-examine its decision affirming the Federal Communications Commission's approval of WMAL-TV's license renewal and dismissal of petitioners' Petition to Deny the Renewal Application. Petitioners contend that four major issues require reconsideration:

(1) The court failed to recognize that WMAL violated its special and separate duty to ascertain the tastes, needs and desires of its community of service *during* its license period.

(2) The court improperly rejected petitioners' statistical prima facie showing of employment discrimination by WMAL during 1966–1969.

(3) The court failed to respond to petitioners' contentions that WMAL's programming was not responsive to the tastes, needs and desires of the majority black community in Washington, D. C.

(4) The court applied an inappropriate standard of review in holding that petitioners were not entitled to a hearing on whether WMAL had misrepresented its contacts with black community leaders in its license renewal application.

We hold that none of these contentions requires a rehearing of this case, but we take this opportunity to make the following comments.

■ In our panel opinion, we held that it was not harmful to the public interest to allow a licensee to submit an amendment to its prospective ascertainment findings, even after a Petition to Deny has been filed.[1] The FCC's rule

---

tiple ownership, within the scope of the FCC's Rules as now written, *see* note 50, *supra*, and in the absence of allegations of specific abuses arising from such ownership, should not bar WMAL–TV's license renewal application. *See, e. g.,* Hale v. FCC, 138 U.S.App.D.C. 125, 128–129, 425 F.2d 556, 559–560 (1970).

55. *See* note 50, *supra.*

56. *See* note 52, *supra,* Hale v. FCC, 138 U.S.App.D.C., at 129, 425 F.2d, at 560.

1. Our decision does not sanction the last minute upgrading of a licensee's obligation to ascertain community tastes, needs and interests *during its license period.* The standards of ascertainment on which WMAL may have fallen short prior to its amendment were among those which the FCC has articulated in defining a duty

to ascertain *prospectively*—at the very close of a license period, immediately prior to a license transfer, or immediately prior to a construction application. *See, e. g.,* Suburban Broadcasters, 30 F.C.C. 1021 (1961) ; Higson–Frank Radio Enterprises, 36 F.C.C. 1391 (1964) ; Minshall Broadcasting Co., 11 F.C.C.2d 796 (1968) ; Sioux Empire Broadcasting Co., 16 F.C.C.2d 995 (1969) ; City of Camden, 18 F.C.C.2d 412 (1969).

The FCC has specifically defined the *ongoing* duty of a licensee to ascertain during its license period only in broader terms : "licensees are expected to remain conversant with, and attentive to, community problems throughout the license period. . . ." Primer on Ascertainment of Community Problems, 20 F.C.C. 2d 880, 883 (1969).

permitting such amendments is clear[2] and has been consistently implemented.[3] Such a rule is not contrary to the public interest because of the prospective nature of renewal ascertainment efforts, particularly when in the interim the ascertainment standards are refined and codified.[4]

However, it would be unreasonable and harmful to the public interest for the FCC to acquiesce in a pattern of this behavior. If in the future any individual licensee persists in waiting for a Petition to Deny, or withholds ascertainment findings of its own to remedy its prospective efforts, this could amount to bad faith and should not be countenanced. At the very least it would raise an issue requiring designation for hearing, since allowing repeated submission of last minute amendments might well encourage some licensees to run the risk of engaging in similar dilatory conduct on the chance that no one would be watching.

Furthermore, acquiescence in a pattern of such conduct might discourage representatives of the public from submitting Petitions to Deny, since it would convey the message that the renewal process is a meaningless exercise, or a never-ending battle for which they have insufficient resources. This is not our view. The participation of petitioners in this case was effective in forcing WMAL to conform its prospective ascertainment to current FCC standards, and in pointing out that future deviation will not be tolerated. We do not view this as defeat for petitioners, but as successful public intervention which this court has consistently welcomed as serving the public interest.

Although a petitioner may not succeed in depriving a broadcaster of its license, there remain numerous ways— for example, more vigorous ascertainment responses, and economic, moral and social pressures—in which a unified community can shape the programming of a licensee, and which effectively supplement the constitutional and statutory authority of the FCC.

Finally, our opinion does not hold that statistical evidence of an extremely low rate of minority employment will never constitute a prima facie showing of discrimination, or "pattern of substantial failure to accord equal employment opportunities." Petitioners' evidence was not an adequate showing in this case because their assertion that WMAL's record stood at 7% black employment in an area 70% black was somewhat misleading. In evidence before the FCC was data that approximately 24% of the entire Washington, D. C. metropolitan area is black.[5] WMAL's employment of approximately 7% blacks out of this total metropolitan area is within the zone of reasonableness.[6]

Petitioners' remaining contentions are adequately dealt with in our original opinion. Accordingly, the petition for rehearing is

Denied.

---

This ruling supplements the FCC's general statement that a principal ingredient of the obligation to operate a station in the public interest is the "diligent, positive and continuing effort by the licensee to discover and fulfill the tastes, needs and desires of his community of service area. . . ." Commission En Banc Programming Inquiry, 20 Pike & Fischer R.R. 1901, 1915 (1960).

2. 47 C.F.R. § 1.522(a).

3. North American Broadcasting Co., 29 F.C.C.2d 69 (1971); Rizner Broadcasting, Inc., 28 F.C.C.2d 330 (1971); Andy Valley Broadcasting System, Inc., 12 F.C.C.2d 3 (1968).

4. As was the case in 1969. It should also be noted that the final form of the Primer on Ascertainment of Community Problems, 27 F.C.C.2d 650 (1971), deliberately omits coverage of the ascertainment duties of a licensee seeking renewal. Id. at 655.

5. Appendix at p. 503.

6. Cf. Muniz v. Beto, 434 F.2d 697 (5th Cir. 1970) (Spanish population within an entire county compared with the number of people with Spanish surnames who served on a grand jury); and Parham v. Southwestern Bell Telephone Co., 433 F.2d 421 (8th Cir. 1970) (black population of Arkansas compared with percentage of blacks in Southwestern Bell's work force in that state).