**NATIONAL BLACK MEDIA
COALITION, Appellant,**

v.

**FEDERAL COMMUNICATIONS
COMMISSION, Appellee,**

Walt-West Enterprises, Inc., Intervenor.

No. 84–1467.

United States Court of Appeals,
District of Columbia Circuit.

Argued Sept. 9, 1985.

Decided Oct. 22, 1985.

David E. Honig, Washington, D.C., for appellant.

David Silberman, Atty., F.C.C., Washington, D.C., for appellee. Jack D. Smith, Gen. Counsel, David M. Armstrong, Associate Gen. Counsel, and Sue Ann Preskill, Counsel, F.C.C., Washington, D.C., were on the brief, for appellee.

Julian P. Freret, Washington, D.C. was on the brief, for intervenor.

Before WALD, EDWARDS, and STARR, Circuit Judges.

WALD, Circuit Judge:

Petitioner, National Black Media Coalition, Inc. (NBMC), has brought this action to challenge the Federal Communications Commission's (FCC or Commission) order granting Walt-West Enterprises, Inc. a seven year license to operate WYEN (FM), Des Plaines, Illinois. This case requires us to look at the extent to which the Commission may consider post-term improvements in a licensee's compliance with the Commission's Equal Employment Opportunity (EEO) program, and the extent to which the Commission must provide reasons when it strays from previously adopted policy. We hold that the Commission's consideration of the station's post-term improvements was not consistent with the dictates of its own policy as set forth in *Rust Communications Group, Inc.*, 73 F.C.C.2d 39 (1979), *aff'd sub nom. Metro-Act of Rochester, Inc. v. FCC*, 670 F.2d 202 (D.C.Cir. 1981), and that the Commission did not provide sufficient explanation to justify this departure from policy. Moreover, the Commission failed to explain why it accorded dispositive weight to evidence which it has in the past proclaimed to be of minimal probative value. We remand the case to the Commission, therefore, for it to take action consistent with *Rust* or to justify its departure therefrom, and to issue a decision that explains its treatment of the evidence before it.

## I. BACKGROUND

### A. *Development of FCC's EEO Policy*

As part of its mandate to develop a radio communication service for "all the people of the United States," 47 U.S.C. § 151, the FCC has developed rules and policies to ensure that broadcast licensees strive to satisfy, and are sensitive to, the needs of their communities. Basic among these rules is that a licensee who discriminates in employment or fails to engage in an effec-

tive EEO program cannot be said to be operating in the "public interest." *See Bilingual Bicultural Coalition on Mass Media, Inc. v. FCC,* 595 F.2d 621, 628 (D.C. Cir.1978) (en banc).

The FCC's monitoring of licensees' employment of minorities began in 1968 when the Commission concluded that "if the broadcast media is to fully meet [its] obligation to communicate in the highest sense of that abused term ... there must be greater use of the Negro in journalism." *In the Matter of Petition for Rulemaking to Require Broadcast Licensees to Show Nondiscrimination in Their Employment Practices,* 13 F.C.C.2d 766, 774 (1968) (citing *Report of the National Advisory Commission on Civil Disorders* ("Civil Disorders Report") 211–12 (1968)). The Commission stressed that compliance with the then recently enacted Title VII was not sufficient to accomplish this goal: "simply to comply with the requirements of the national policy—to say, 'We can't find qualified Negroes'—is not enough." *Id.* at 774–75. Rather, an exerted effort needed to be undertaken, "to employ enough Negroes in positions of significant responsibility to establish an effective link to Negro actions and ideas and to meet legitimate employment expectations." *Id.* at 774 (quoting *Civil Disorders Report* at 211).[1]

The Commission, therefore, promulgated regulations requiring every station to "establish, maintain, and carry out, a positive continuing program of specific practices designed to assure equal opportunity in every aspect of station employment policy and practice." *In the matter of Petition for Rulemaking to Require Broadcast Licensees to Show Nondiscrimination in Their Employment Practices,* 18 F.C.C.2d 240, 245 (1969). One year later, in order to monitor licensees' compliance with the new

rules, the Commission adopted regulations requiring stations with 5 or more employees to submit an annual report categorizing its employees and to submit their EEO programs indicating the specific practices they follow in ensuring equal employment opportunities for minorities. *In re Petition for Rulemaking to Require Broadcast Licensees to Show Nondiscrimination in Their Employment Practices,* 23 F.C.C.2d 430 (1970). In so doing it acknowledged that raw figures alone could never be dispositive of whether a station discriminated in hiring or had adopted a meaningful EEO policy. Nonetheless, it considered the data useful "to show industry employment patterns and to raise appropriate questions as to the cause of such patterns." *Id.* at 431. The role of the report was to trigger a closer look at a station's policies if its record of employing minorities was poor.

Until 1972, the FCC reviewed the statistics on a case-by-case basis, generally concluding that low minority employment was not in itself enough to require an evidentiary hearing. *See, e.g., Time-Life Broadcast, Inc.,* 33 F.C.C.2d 1050, 1058–59 (1972); *Universal Communications Corp.,* 27 F.C.C.2d 1022, 1028 (1971). In 1972, however, the Commission issued processing guidelines indicating when it would conduct an in-depth review of a station's EEO compliance. The 1972 guidelines applied to stations with ten or more full-time employees and called for review only if there were either no women or minority employees or if there was a reduction in the number of women or minority employees from the previous year. *See Equal Employment Opportunity Processing Guideline Modifications for Broadcast Renewal Applicants ("EEO Processing Guidelines"),* 79 F.C.C.2d 922, 929 (1980) (discussing 1972 guidelines).

---

**1.** Although much of the Commission's discussion focused on equal employment opportunities for blacks, the initial Commission action of 1970 dealt with Blacks, Orientals, American Indians, and Spanish sur-named Americans. A 1971 order included women in the scheme. *See Equal Employment Program,* 32 F.C.C.2d 708 (1971). Presently, the following racial or ethnic

categories are included: American Indians and Alaska Natives; Asians and Pacific Islanders; Blacks, not of Hispanic origin; and Hispanics. *See Amendment of Broadcast Equal Employment Opportunity Rules and FCC Form 395 ("Form 395 amendments"),* 70 F.C.C.2d 1466, 1479 (1979).

This court's decision in *Stone v. FCC,* 466 F.2d 316 (D.C.Cir.1972), introduced a new element into the evolving scheme of processing employment statistics. In *Stone,* the court dismissed a challenge to an FCC decision to renew a station's license. The plaintiffs had alleged that the station's employment practices were discriminatory against blacks, and argued that the statistics evidenced a *prima facie* case of such discrimination. In rejecting this claim the court explained that it was not holding "that statistical evidence of an extremely low rate of minority employment will never constitute a prima facie showing of discrimination, or 'pattern of substantial failure to accord equal employment opportunities.'" *Id.* at 332. Rather, the court held that the station's "employment of 7% blacks out of this total metropolitan area is within the *zone of reasonableness.*" *Id.* (emphasis added). After *Stone* it was no longer sufficient to examine raw numbers alone. Those numbers now had to be compared with the labor workforce figures for the geographic area. Although in *Stone* the court found the station's employment figures to be reasonable as compared to the local labor force, the court explicitly left open the possibility that some other stations' might not be.[2]

The Commission quickly adopted the "zone of reasonableness" concept in its own adjudications. *See Inquiry Into the Employment Policies and Practices of Certain Broadcast Stations Located in Florida,* 44 F.C.C.2d 735, *aff'd,* 48 F.C.C.2d 666 (1974). In the *Florida* case, after distinguishing between the nondiscrimination and affirmative action aspects of its rules, the Commission noted that "[a]s part of a licensee's affirmative action obligation, particularly in cases where its employment profile falls below a zone of reasonableness, the licensee must modify or supplement its recruitment practices and policies by vigorous and systematic efforts to locate and encourage the candidacy of qualified minorities and women." *Id.* at 736. In that case, the numerical disparity was enough to support the imposition of reporting requirements to ensure future compliance.

The Commission's whole-hearted acceptance of the "zone" concept was evident in its decision in *Mission Central Company,* 54 F.C.C.2d 581, 586 (1975), *aff'd,* 83 F.C.C.2d 330 (1980). There, the Commission explained that the "zone" is a "dynamic concept, which contracts as licensees are given time to implement our antidiscrimination rules and policy." Thus, it warned that the fact that 1972 figures were within the "zone of reasonableness" did not mean that comparable 1975 figures were. *See also National Organization for Women v. FCC,* 555 F.2d 1002, 1018 (D.C.Cir.1977).

In 1977 the Commission announced guidelines incorporating the "zone of reasonableness" by establishing numerical formulae to be used in monitoring whether a licensee was within the "zone" or whether further inquiry was necessary. The Commission announced that it intended to conduct in-depth reviews of stations whose percentage of minority employees was less than 50% of the percentage of minority employees in the local labor force. For example, in a geographic area where 30% of the labor force is comprised of minority employees, the Commission would review a station if less than 15% of its employees were members of a minority. Moreover, the new guidelines established a distinct "zone" inquiry for upper level positions. A station would be scrutinized if the percentage of minority employees in the top four[3] positions was less than 25% of the percentage of minorities in the overall labor force. *EEO Processing Guidelines,* 79 F.C.C.2d at 930. Effective April 1, 1980, the level for

---

2. The court's finding of reasonableness was not based solely on the percentage of minorities employed. The court carefully evaluated the station's recruitment efforts and hiring practices before concluding that the station's record was reasonable. *Stone,* 466·F.2d at 329–30.

3. The "top" four positions refer to categorizations on FCC Form 395 (Annual Employment Report). They are (1) officials and managers; (2) professionals; (3) technicians; and (4) sales workers. *See Form 395 amendments,* 70 F.C.C.2d at 1478.

employment in the "top" four categories was raised to 50% as well.[4] *See Id.*

■ The Commission has historically treated hiring outside of the "zone" as a red flag which triggers further evaluation of a station's employment practices. *See Bilingual,* 595 F.2d at 641–46 (Robinson, J., concurring in part and dissenting in part) (discussing role that statistics have played in FCC proceedings). The ultimate determination of whether a station is fulfilling its obligations comes through inquiry into the station's actual recruitment and hiring practices. *See Nondiscrimination in the Employment Policies and Practices of Broadcast Licensees,* 60 F.C.C.2d 226, 229 (1976). In extreme cases the Commission has ordered hearings to evaluate the reasons for a poor minority employment record. *See New Mexico Broadcasting Co., Inc.,* 54 F.C.C.2d 126 (1975). In cases with less dramatic deficiencies, the Commission has ordered the licensee to undertake, and submit detailed reports of, additional efforts in the area of affirmative action. *See, e.g., KCOP Television, Inc.,* 57 F.C.C.2d 227 (1975), *aff'd* 73 F.C.C.2d 207 (1979); *Scott Broadcasting Corp.,* 52 F.C.C.2d 1029 (1979); *see generally Bilingual,* 595 F.2d at 628–31 (discussing Commission's discretion to choose between holding hearing or conducting investigation).

## B. *The Renewal Process*

The primary method through which the FCC fulfills its duty to ensure that licensees comport with the "public interest" requirement is by scrutinizing applicants for licenses and license renewals.[5] The Communications Act states that the Commission may only grant a license if the Commission "upon examination of [the] applica-

tion, and upon consideration of such other matters as the Commission may officially notice, shall find that public interest, convenience and necessity would be served by the granting thereof." 47 U.S.C. § 309(a). While the application is pending, any party in interest may file a petition to deny the application. 47 U.S.C. § 309(d)(1). The Commission must either hold hearings on such a petition, or, if the Commission finds that there is no "substantial and material questions of fact," issue a concise statement of the reasons for denying the petition. 47 U.S.C. § 309(d)(2).

The issue of compliance with the FCC's EEO policy has generally arisen in the context of petitions to deny applications, typically filed by public interest groups such as NBMC.[6] These petitions often point to the fact that a stations' hiring is below the guidelines set by the FCC and that the station's EEO policy is weak. The Commission then has the duty to review the evidence of a station's hiring practices and EEO policy to determine whether it conforms with FCC regulations. The purpose of the inquiry is to predict prospective behavior—whether a new license will be in the public interest—the method of the inquiry, however, is necessarily historical—it looks to the licensee's behavior over the course of the past license in order to predict future behavior. *See Bilingual,* 595 F.2d at 628–30; *Office of Communication of United Church of Christ v. FCC,* 359 F.2d 994, 1007 (D.C.Cir. 1966).

## C. *WYEN and the Chicago Metropolitan Area*

Since 1971, Walt-West Enterprises, Inc., has been licensed to operate an FM radio station in Des Plaines, Illinois, a northwest

---

**4.** The 1978 guidelines applied to stations with more than 10 full-time employees. The 1980 modifications extended the guidelines to stations with 5 to 10 full-time employees as well. *See EEO Processing Guidelines,* 79 F.C.C.2d at 923. The 25% "top four" guideline was maintained for stations with 5 to 10 employees, however. *Id.*

**5.** Until 1981, licenses were issued for three year periods. In 1981, Congress amended the Com-

munications Act to allow for seven year licenses. 47 U.S.C. § 307(c) Applications for renewal must be filed no later than the "first day of the fourth full calendar month prior to the expiration of the license sought to be renewed." 47 C.F.R. § 73.3539(a).

**6.** Of course, the Commission has a duty to make a "public interest" determination in all cases—whether or not a petition to deny is filed.

suburb of Chicago. Beginning with WYEN's 1976 application for renewal, the FCC has evinced concern about the possibility that the station has not engaged in a meaningful EEO program. As is usually the case, the red flag that attracted the Commission's attention was the great disparity between the percentage of available minority employees in the Chicago area and the percentage of minorities among the station's employees. The substance of the Commission's concern, however, has been the licensee's cavalier failure to recruit aggressively from minority sources.

■■■■ For purposes of its processing guidelines, the FCC has adopted the State of Illinois's assessment of a 20.3% minority labor force in the Chicago metropolitan area. *In re License. Renewal Applications of Certain Broadcast Stations Serving the Chicago Metropolitan Area ("Chicago Renewals")*, 89 F.C.C.2d 1031, 1033 (1982) (citing *Labor Force Information for Affirmative Action Programs—1978, State of Illinois*). Based upon this figure, the processing guidelines would require investigation if a Chicago area station's minority employment fell below approximately 10%. Before 1980, employment in the "top" four categories should have been in the range of 5%, and after 1980 it too should have approximated the 10% level.[7]

The technical details of adopting exact census figures, carrying out precise mathematical computations, and defining the exact "zone of reasonableness" are all unnecessary in this case in view of the great disparity between the approximate labor force percentages and WYEN's actual employment figures. Through the first eight years of its license the station maintained a staff of between 19 and 22 full-time employees. Yet during this entire period the station reported employing only one minority employee—and even he was employed for less than one year, during 1978. *See*

---

7. In *De Medina v. Reinhardt,* 686 F.2d 997 (D.C. Cir.1982), this court held that, in adjudicating claims of discrimination under Title VII "where specialized skills are legitimately required for employment, 'the proper comparison is between the composition of the [employer's] work force and the *qualified* population.' " *Id.* at 1003 (emphasis added) (quoting *Davis v. Califano,* 613 F.2d 957, 963 (D.C.Cir.1979) (as amended Feb. 14, 1980)); *see also Valentino v. United States Postal Service,* 674 F.2d 56, 68 (D.C.Cir.1982). There are several reasons, however, why this finding vis-a-vis Title VII has no effect on the case before us here.

First, unlike Title VII which is an anti-discrimination measure, the FCC's EEO policy is an affirmative action program which was designed to go beyond the requirements of Title VII. *See* In the Matter of Petition for Rulemaking to Require Broadcast Licensees to Show Nondiscrimination in Their Employment Practices, 13 F.C.C.2d 766, 773–75 (1968). The FCC has explicitly rejected petitions asking that it reevaluate its processing guidelines to take account only of the "qualified" labor force. *See EEO Processing Guidelines,* 79 F.C.C.2d at 928–32; Nondiscrimination in the Employment Policies and Practices of Broadcast Licensees, 60 F.C.C.2d 226, 232 (1976).

Second, while the Commission certainly has the authority to reevaluate its policies and adopt a different system of evaluating statistics, it has never done so. We cannot sanction ad hoc departures from clear agency policies simply because the agency might be able to justify such a departure if it attempted to do so. *See infra* at

354, 355–56. Neither the Commission nor the station has sought to explain the decision on these terms and even if they had, they would face an impossible hurdle since the decision makes no mention of any such factor. *See infra* p. 354. Similarly, since the statistics are used in these cases only to trigger closer review, the Commission is certainly entitled to take the qualified/non-qualified distinction into account in evaluating the "zone of reasonableness." *See EEO Processing Guidelines,* 79 F.C.C.2d at 932 ("The Commission will, in its in-depth reviews, take cognizance of a licensee's inability to employ women or minorities in positions for which the licensee documents that only a very limited number of women or minority group members have the requisite skills."). There is nothing in the record, however, to show that this was a factor in its decision in this case.

Finally, in the context of this case there is reason to doubt that there is a significant difference between qualified labor force and general labor force. If there were, then one would expect that many of the area's radio stations would have difficulty in meeting the Commission's statistical guidelines. To date, this has not at all been the case. *See, e.g., Chicago Renewals,* 89 F.C.C.2d at 1031 (granting full-term licenses to 19 stations but holding WYEN's license in abeyance in light of its poor hiring statistics). In any event, neither the Commission nor the station has sought to explain the decision in this case on these terms.

*Chicago Renewals,* 89 F.C.C.2d at 1042. In late 1979, the station reported another minority member among its 23 employees (4.3%), *id.,* and in 1981 the total rose to 2 out of 24 (8.5%). *See Walt-West Enterprises, Inc.,* 98 F.C.C.2d 844, 847–49 (1984). In 1982, the station again reported only one minority employee among its 21 (4.7%) full-time employees. Not until 1983 and 1984 did the numbers rise to 3 out of 21 (14.3%) and 2 out of 18 (11.1%), respectively. *Id.*

The dearth of minority employees did not go unnoticed by the Commission and a number of watchdog groups. When the station applied for a three year renewal for the years 1976–1979, the poor statistical data prompted the Commission to review the station's recruitment efforts. After that review, the Commission declined to grant a full-term renewal. Instead, it granted a one year short-term renewal and conditioned that upon the station's submission of a revised EEOC program and periodic employment reports. *See Chicago Renewals,* 89 F.C.C.2d at 1043. This decision was based on the Commission's conclusion that the licensee had failed to implement a meaningful recruitment program. For example, although the station maintained contact with some potential minority recruitment sources, the Commission was concerned that there may have been "a less than vigorous effort of the part of licensee to keep these sources apprised of job openings at the station." *Id.* at 1042. Indeed, the Commission noted that the station admitted that its "contacts with minority organizations have been directed primarily toward ascertainment of community needs" in programming and not toward recruiting minority employees. *Id.*

In anticipation of the expiration of its short-term renewal, WYEN filed a renewal application in 1979. This application was opposed by the Latino Committee on the Media which filed a petition to deny. *See id.* at 1031–32. The Commission's decision on WYEN's 1979 application, issued on April 27, 1982, held that "[i]n view of the sustained period of EEO performance outside of acceptable guidelines even during periods of close Commission scrutiny, and

in consideration of the most recent renewal period [1976–1979] reflecting a low number of applications received from minorities and minimal recruitment efforts, grant of renewal is not now warranted." *Id.* at 1042–43. Although the station claimed that "its suburban location and relative remoteness from public transportation are the main obstacles to obtaining applications from minorities," the Commission was not convinced by this argument and remained "concerned" that the small number of minority applications may have been the result of the manner in which the station conducted its EEO program. *Id.* at 1042. Then, in a decision which forms part of the basis of this appeal, the Commission stated: *"the station's 1979 renewal application as well as the supplemental renewal due to be filed on August 1, 1982, will be held in abeyance for approximately one year. This will permit the Commission a further opportunity to monitor more closely the station's implementation of its EEO program." Id.* at 1043 (emphasis added).

On November 1, 1982, NBMC filed a petition to deny the 1982 application that WYEN had filed. The Commission denied that petition, without hearing, on June 27, 1984, and adopted the *order* now on appeal. Finding that the station had recently improved its employment statistics and recruitment efforts, the Commission awarded WYEN a full-term, seven year license. Commissioner Rivera dissented and argued that, in view of the long history of noncompliance, it was improper not to impose heightened reporting requirements on the station. NBMC now appeals the Commission's decision to award the license without having held a hearing and without imposing heightened reporting obligations on the station.

## II. The Propriety of Considering Post-Term Improvements

### A. *The* Rust *Rule*

In its application for a license renewal, a licensee presents data pertaining to its performance during the term that is about to

expire. An application for renewal is filed no later than approximately four months before the current license is to expire. *See supra* note 3. The Commission then makes its renewal decision on the basis of this information. The Communications Act provides that no decision on renewal is to issue more than thirty days prior to the expiration of the current license. 47 U.S.C. § 307(e). If, indeed, decisions did issue on that schedule, then the problem of determining from what time frame evidence should be viewed would never arise. But decisions are often delayed for years, especially when an application is contested. In these cases the Commission has had to set policies about what period's evidence will be looked at. It has had to choose between reviewing the evidence as of the date the license expires or, alternatively, reviewing all evidence available at the time the application is finally decided upon.

■ The Commission has long adhered to a policy of looking at the evidence as of the end of the expired term. As a general matter, "[i]t has been basic to the understanding of the renewal process by both Congress and the Commission that a licensee runs on his past record." *Alianza Federal de Mercedes v. FCC*, 539 F.2d 732, 735 (D.C.Cir.1976). In 1970, for example, the Commission announced that a "renewal applicant must run upon his past record in the last license term.... No evidence of upgrading [after an opposing application or a petition to deny is filed] will be accepted or may be relied upon." *Policy Statement Concerning Comparative Hearings Involving Regular Renewal Applicants*, 22 F.C.C.2d 424, 427 (1970), *rev'd on other grounds sub nom. Citizens' Communications Center v. FCC*, 447 F.2d 1201 (1971); *see also The Trustees of the University of Pennsylvania Radio Station WXPN* (FM) ("WXPN"), 69 F.C.C.2d 1394, 1424 (1978) (post-term improvements in control structure of a licensee are to be ignored); *Alabama Educational Television Commission* ("AETC"), 50 F.C.C.2d 461, 475–76 (1975) (matter of common sense that post-term upgrading in programming is of minimal value).

The Commission's policy of making an applicant "run on his record" is based on the sound proposition that a licensee's behavior while "under the gun" is not especially probative of how the licensee will act when the pressure is removed, *i.e.*, once a license is granted. *See Walton Broadcasting, Inc.*, 78 F.C.C.2d 857, 876–77 (1980) (not unreasonable to conclude that post-term improvements were made "only to save license"). Moreover, allowing licensees to take advantage of processing delays created by competing or opposing applications would provide a disincentive to those contemplating opposing a licensee's application. *See AETC*, 50 F.C.C.2d 461, 476 (1975).

Until 1979, notwithstanding this general policy, the Commission did consider post-term improvements in evaluating EEO compliance. Indeed, this court upheld its authority to do so in *National Organization for Women v. FCC*, 555 F.2d 1002 (D.C.Cir.1977). The reason for the different approach to EEO was to give licensees time to accustom themselves to the new requirements; "until 1968 broadcast licensees had no affirmative equal employment responsibilities imposed specifically by the Commission." *WXPN*, 69 F.C.C.2d at 1424. But, the Commission emphasized, "[t]o accomplish the Commission's goals in this area, the acceptance of post-term improvements need not become a permanent exception to the Commission's general policy." *Id.* at 1424–25.

In its 1979 decision in *Rust Communications Group, Inc.*, 73 F.C.C.2d 39 (1979), *aff'd sub nom. Metro-Act of Rochester, Inc. v. FCC*, 670 F.2d 202 (D.C.Cir.1981), the Commission decided that the time had come to bring its EEO post-term policy into line with its general post-term policy. In *Rust*, the administrative law judge had held that a decision based on the station's performance during the prior term would have resulted in denial of the application for renewal. Yet, because of the improvements during the course of the Commission's investigation, he determined that the

lesser sanction of short-term renewal was appropriate. Although the Commission upheld that decision it stated that

> this case teaches us that the time is past for prospective-only enforcement of our equal employment opportunity rules. Accordingly, we today put all licensees on notice that we will no longer permit post-term upgrading to mitigate an inadequate EEO record during the license term under review.... Henceforth, on EEO performance a renewal applicant will be required to 'run on his [license term] record.'

*Id.* at 42 (quoting *Office of Communication of the United Church of Christ v. FCC,* 359 F.2d 994, 1007 (D.C.Cir.1966)).

The Commission explained that the "policy is rooted in the common sense proposition that enforcement of the public interest obligation of broadcasters cannot be meaningful if licensees are free to perform inadequately during their franchise period, secure in the knowledge that post-term efforts would guarantee renewal if a challenge should ever be mounted." *Id.* at 51 (quoting *AETC,* 50 F.C.C.2d at 476).

The exact terms of the rule adopted in *Rust* were that as of August 2, 1979, the FCC would

> not consider post-term EEO evidence at all if the licensee's term-time EEO record is so dificient [sic] that it, standing alone, would warrant denial of renewal or other sanctions. Such a deficient record could result from the licensee's violation of either of its two basic EEO obligations— nondiscriminatory treatment of all employees and the maintenance of a vigorous, continuing affirmative action program.... When license term conduct shows some evidence of compliance with our EEO rules, e.g., by the establishment or implementation of specific recruiting efforts, we may consider post-term activities, including hiring statistics, as evidence of a good faith effort to implement the program instituted during the license term.

*Id.* at 53 (footnotes deleted). Since the *Rust* decision, the Commission has applied the rule to exclude post-term consideration in a number of cases. *See, e.g., In re Application of Certain Broadcast Stations Serving Communities in the States of Alabama and Georgia,* 95 F.C.C.2d 1, 10 n. 26 (1983); *In re Applications of Mission Central Company,* 83 F.C.C.2d 330, 335–36 (1980); *In re Application of KHVH Inc.,* 77 F.C.C.2d 890, 894 (1980); *In re Applications of Christian Broadcasting Association,* 77 F.C.C.2d 858, 861 (1980). In those cases where the Commission has considered post-term evidence it has always complied with *Rust* by carefully ascertaining whether there was a sufficient nexus between the post-term evidence and the in-term EEO program. *See, e.g., In re Applications of Certain Broadcasting Stations Serving Communities in the State of Texas,* 99 F.C.C.2d 377, 381 nn. 10–11, 383, 384 (1984); *In re Application of CBS, Inc.,* 82 F.C.C.2d 227, 230 (1980); *In re Applications of the University of North Carolina at Chapel Hill,* 79 F.C.C.2d 248, 249 n. 2 (1980).

B. *The Decision in This Case*

On April 27, 1982 the Commission issued an Order holding WYEN's 1979 and 1982 applications in abeyance. Under the terms of *Rust,* review of the 1979 application should have involved looking at the station's record prior to and during the 1976–1979 term and review of the 1982 application should have involved review of the station's record prior to and during the 1979–1982 term. Absent some special justification, no improvements occurring after the end of the 1982 term—November 30, 1982—should have been considered.

There is no doubt, and indeed the Commission does not refute, that it based its 1984 action granting a seven-year license to WYEN on improvements that occurred after both of the relevant terms had expired—after November 30, 1982. After reviewing the station's poor history, the Commission noted that the station now reported that 3 out of 21 (14.3%) of its full-time employees were black and that all three occupied positions in the upper-four categories. *Walt-West Enterprises, Inc. ("Walt-*

*West*"), 98 F.C.C.2d 844, 849 (1984). The Commission also pointed to the fact that 3 out of the station's six (50%) part-time employees were minorities, again all in upper level positions. *Id.* These figures are dramatically different[8] than those the Commission would have encountered had it looked to the employment figures of 1979, of 1982, or any period in between.

◼ The Commission's analysis of the station's actual recruitment efforts was similarly deficient in its failure to distinguish between pre-1979, pre-1982, and post-1982 improvements. Analysis of the actual recruitment program is, of course, the ultimate inquiry in the process. The Commission seemed to have based much of its conclusion that the station had improved its recruitment program on the report that the station filed on April 13, 1983. That report encompassed the period between April 27, 1982, and March 31, 1983, and the Commission made no attempt to focus on the midterm evidence alone. Similarly, the Commission put weight on the fact that "[f]or the traffic manager position, the station ... sent letters to minority organizations, resulting in the employment of a black female." *Id.* That activity, however, did not take place until well after the expiration of the term; the black woman mentioned was hired on January 31, 1983. J.A. at 116. These examples make it clear that the Commission relied in part on post-term recruitment efforts to reach its conclusion that the station merited a full-term, no-strings attached, license.

## C. *The Commission's Justifications for Looking at the Post-Term Evidence*

In the course of its decision, briefs, and oral presentation before this court, the Commission and its counsel have forwarded three alternative rationales as to why consideration of the post-term evidence in WYEN's case was not in conflict with *Rust.* First, the Commission explained in its decision that it was appropriate to consider post-term evidence because the 1982 abeyance order had been intended to afford the station a chance to improve its record before a final decision would be made on its application; second, counsel now argues that the abeyance was itself a sanction and that the later consideration was an element of the sanction—not part of the review of the application. Finally, counsel now argues that *Rust* was inapplicable on its own terms since there was a sufficient nexus between the post-term improvements and the in-term program. We deal with and reject these arguments individually.

### 1. *The Function of the Abeyance*

In its 1984 decision, the Commission addressed the question of whether its action was consistent with *Rust.* Rejecting NBMC's argument that it was improper to look at the evidence, the Commission explained that "[i]n our view, holding the license in abeyance was intended as a final opportunity for developing a more effective affirmative action program in an effort to improve recruitment practices and to increase the flow of minority and women applicants. Thus, *Rust* is inapplicable." *Walt-West*, 98 F.C.C.2d at 850 n. 18.

◼ The Commission's explanation implies that the only relevant issue is whether the abeyance had been issued with the intent of allowing consideration of post-term evidence. But the fact that the Commission issued the abeyance with such intentions does not mean that it had the authority to do so. *Rust* is not a canon of construction of the Commission's intent. It is a substantive rule that the Commission bound itself to follow—at least until it announces and explains a change in policy. *See infra* pp. 355–56. Thus, the focus of our inquiry must turn to whether the abeyance procedure used in this case is consistent with the rule of *Rust.*

◼ By holding a renewal application in abeyance, the Commission does no more

---

**8.** For example, during its 1979 reporting period the station had no minority employees at all. *See Chicago Renewals,* 89 F.C.C.2d at 1042. In fact, it had employed just one minority employ-

ee since its inception. During the 1982 reporting period, the station reported one full-time minority employee. *See Walt-West,* 98 F.C.C.2d at 848.

than to make it official that there will be a delay in deciding on an application. The abeyance can, of course, serve important functions. For example, it gives the Commission an opportunity to impose heightened reporting requirements until a final decision is reached.[9] But aside from any specific requirements that might be imposed in conjunction with the abeyance, the licensee's rights and duties remain the same whether its application is simply delayed or, alternatively, is held in abeyance. Consequently, it would be a charade to suggest that the "abeyance" order has the effect of removing the *Rust* issue. *Rust* was developed specifically to govern in situations of delay between the end of term and decision on the application. That this delay is formalized has no effect on any of the underlying policies that gave rise to *Rust*.[10]

In its brief, the Commission now argues that it would have made no sense for it to have held the application in abeyance and then refuse to consider the station's record subsequent to the decision. This may or may not be true. But we are not reviewing the sensibility of the 1982 abeyance decision; we are reviewing the legality of the 1984 licensing decision. If indeed the Commission erred in 1982 in expecting that the abeyance made the *Rust* rule inapplicable, this is no reason to exacerbate the error by sanctioning the actual departure from the rule. Unless there is some other justification, the stark announcement of an abeyance does not itself justify the Commission's contravention of the *Rust* rule.

### 2. *The Abeyance as a Sanction*

■ The Commission now argues that the abeyance order represented the Commission's decision on the merits and that its decision to hold the matter in abeyance was in itself a sanction. The subsequent review, it argues, was part of the sanction that it imposed on the station and therefore, it concludes, it was not really looking at post-term data in the way that *Rust* forbids. This argument fails for two reasons. First, it does not comport with the facts of this case. Second, it results in *sub silentio* repeal of the *Rust* rule at the Commission's whim.

The facts and language surrounding the abeyance order do not support the contention that it was a sanction. When the April, 1982, decision was made to hold WYEN's applications in abeyance, the FCC had only one application before it—the 1979 application. Had the abeyance applied to that application alone, it might not have been unreasonable to argue that it was indeed a sanction, especially since it imposed heightened reporting requirements on the station. But in this case, the abeyance applied to two applications—the application that had been submitted in 1979, and the application due on August 1, 1982. It is unreasonable to suggest that the Commission imposed a sanction on the basis of an application that had yet to be submitted. Thus, even if the abeyance and subsequent review of evidence could be construed as a sanction vis-a-vis the 1979 application, it cannot be so construed vis-a-vis the 1982 application.

■ Moreover, the construction that the Commission now asserts, is not consistent with the language that it used. Had the Commission sought to reach a decision on the application and impose a sanction at that time, it could have granted a short-term renewal as it had in 1976.[11] Such a

---

9. Indeed, in this case, the abeyance order was accompanied by an order directing WYEN to submit, within 30 days, an EEO program "setting forth goals and timetables for minority hiring for the next year," and to submit specific employment data once each position is filled, including the referral source and the efforts made to attract minority applicants. *See Chicago Renewal, supra* at 1043.

10. If anything, the abeyance announcement adds to the problem of looking at post-term

evidence since the licensee is put on explicit notice that the Commission is scrutinizing it.

11. The Commission could not, however, issue even a short-term renewal without finding such a license to be in the "public interest, convenience and necessity." 47 U.S.C. § 309(a). In this case the Commission was apparently unable to make such a finding; hence, it held the application in abeyance.

renewal could have carried with it the same heightened reporting requirement that accompanied the abeyance order. The Commission's decision to hold the applications in abeyance is strong evidence that it did not consider itself as having passed judgment on the application. Placing an issue in abeyance is the exact opposite of deciding it, and the Commission's current assertions to the contrary must be rejected.[12]

Aside from its noncongruence with the facts of the case, the asserted justification fails for an even more fundamental reason. If the dictates of *Rust* could be avoided simply by labelling a delay as an "abeyance" then *Rust* would set no predictable limits on review of post-term evidence. There are no statutory or regulatory criteria as to when abeyances are to be ordered, and, as we have indicated, an abeyance order has no real, practical effect on an applicant for renewal. The Commission could, therefore, skirt at will around the rule in *Rust* by ordering abeyances and subsequent review of post-term improvements. This court would be skirting its own responsibility of meaningful judicial review if, instead of demanding reasoned and principled explanations, it allowed the Commission to rely on creative word games to justify departures from its policies.

### 3. Rust *Not Applicable*

■ As an alternative justification for the Commission's consideration of the post-term evidence, counsel asserts that *Rust* allowed considerations because of the in-term efforts that WYEN had made. There is some merit in this argument inasmuch as *Rust* does allow for consideration of post-term improvements if the Commission finds a sufficient nexus between the post-term

results and the mid-term efforts. *See, e.g., In re Applications of Certain Broadcasting Stations Serving Communities in the State of Texas*, 99 F.C.C.2d 377, 381 nn. 10–11, 383, 384 (1984). Had the Commission made the requisite findings for such an interpretation in its decision, we might well have deferred to it. But in this case the Commission never mentioned the possibility that *Rust*'s own exception might apply. Instead, it sought to justify its consideration of the post-term data by virtue of the abeyance theory, a theory which we have rejected. This newly asserted justification is no more than counsel's post hoc rationalization of agency action. As such it is entitled to little or no weight.[13] *See Securities Industry Association v. Board of Governors*, — U.S. —, 104 S.Ct. 2979, 2983, 82 L.Ed.2d 107 (1984) (*"post hoc* rationalizations by counsel for agency action are entitled to little deference"); *Motor Vehicle Manufacturer's Association v. State Farm Mutual Automobile Insurance Co.*, 463 U.S. 29, 50, 103 S.Ct. 2856, 2870, 77 L.Ed.2d 443 (1983) ("an agency's action must be upheld, if at all, on the basis articulated by the agency itself"); *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 419, 91 S.Ct. 814, 825, 28 L.Ed.2d 136 (1971) (rejecting *post hoc* affidavits of agency official themselves).

■ Even if we were willing to look at justifications that the Commission did not assert at the time of the decision, we could not accept this justification in this case. The notion of a nexus between past efforts and post-term statistics is an issue of fact which must be dealt with by the Commission itself. In this case no such finding of fact has been made.[14]

---

**12.** The Commission has four ways of disposing of an application. It can

> (a) grant unconditional renewal where the review indicated that the licensee had complied with its policies and rules, (b) condition renewal upon periodic reporting requirements, (c) require establishment of goals or timetables for eliciting minority or female applicants, or (d) grant a short-term renewal.

Frawley, *Revised Expectations: A Look at the FCC's Equal Employment Opportunity Policies*, 32 Fed.Comm.L.Jour. 291, 310 (1980) (footnotes

omitted). Holding an application in abeyance is obviously not one of the *decisional* options.

**13.** In view of the Commission's explicit adoption of a different justification for its consideration of the post-term data, counsel's assertion of the "nexus" theory is entitled to even less weight than if the agency had been silent altogether.

**14.** Nor is such a finding implicit in the Commission's having considered the evidence. Even if we were willing to engage in such a fiction in

**D. *The Need for Reasoned Explanation When an Agency Departs From Its Stated Rules and Policies***

■ Our analysis leads to the conclusion that the Commission departed from the dictates of *Rust* in this case. Of course, an agency does have the right to develop new policies and methodologies and it is not our place to stand in the way of such development.[15] But it is also a clear tenet of administrative law that if the agency wishes to depart from its consistent precedent it must provide a principled explanation for its change of direction. *See Airmark Corp. v. FAA,* 758 F.2d 685, 691–92 (D.C.Cir.1985); *Advanced Micro Devices v. CAB,* 742 F.2d 1520, 1542 (D.C.Cir.1984); *United States Satellite Broadcasting Co. v. FCC,* 740 F.2d 1177, 1187 (D.C.Cir.1984); *National Resource Defense Council, Inc. v. SEC,* 606 F.2d 1031, 1049 n. 23 (D.C.Cir. 1979); *Local 777, Democratic Union Organizing Committee, Seafarers International Union of North America, AFL–CIO v. NLRB,* 603 F.2d 862, 882 (D.C.Cir. 1978); *International Union, United Automobile Aerospace and Agricultural Implement Workers of America (UAW) v. NLRB,* 459 F.2d 1329, 1341 (D.C.Cir.1972); *Columbia Broadcasting System, Inc. v. FCC,* 454 F.2d 1018, 1026–27 (D.C.Cir. 1971). We have steadfastly held that "an agency changing its course must apply a reasoned analysis indicating that prior poli-

cies and standards are being deliberately changed, not casually ignored". *Greater Boston Television Corp. v. FCC,* 444 F.2d 841, 852 (D.C.Cir.1970), *cert. denied,* 403 U.S. 923, 91 S.Ct. 2229, 29 L.Ed.2d 701 (1971).

Indeed this case illumines the purpose of requiring a statement of reasons for departure from prior agency policy. After announcing a prospective rule and applying it faithfully for six years, the Commission, in effect, ignored it here. This court has no way of knowing whether this departure from precedent was inadvertent or purposeful. If, for example, the Commission mistakenly thought that the rule was inapplicable in this case, this court has the duty to remand the case to the agency for it to make a determination using the standards that it has developed. *See Bowman Transportation, Inc. v. Arkansas-Best Freight System,* 419 U.S. 281, 285, 95 S.Ct. 438, 441, 42 L.Ed.2d 447 (1974) (court must "consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment") (quoting *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 824, 28 L.Ed.2d 136 (1971)). If, on the other hand, this represents a purposeful change of course, then the agency must provide sufficient explanation to ensure us that its new train of thought is not arbitrary,[16] and is not the

some other case, the Commission explicitly adopted an alternative rationale here.

**15.** "'Cumulative experience begets understanding and insight by which judgments … are validated or qualified or invalidated. The constant process of trial and error, on a wider and fuller scale than a single adversary litigation permits, differentiates perhaps more than anything else the administrative from the judicial process.'" *NLRB v. J. Weingarten, Inc.,* 420 U.S. 251, 266, 95 S.Ct. 959, 968, 43 L.Ed.2d 171 (1975) (quoting *NLRB v. Seven-Up Co.,* 344 U.S. 344, 349, 73 S.Ct. 287, 290, 97 L.Ed. 377 (1953)). Nothing in *Weingarten,* or any other case, however, condones administrative changes in policy unaccompanied by an explanation that demonstrates that the agency has reached a "fair and reasoned balance" of competing considerations. *Weingarten,* 420 U.S. at 267, 95 S.Ct. at 968.
 We express no view on whether the Commission could rationally justify abandoning the pol-

icy announced in *Rust.* Any such decision would be subject to review under the arbitrary and capricious standard of review. *See State Farm,* 463 U.S. at 40–44, 103 S.Ct. at 2865–67; *International Ladies' Garment Workers' Union v. Donovan,* 722 F.2d 795, 812–13 (D.C.Cir.1983), *cert. denied,* —— U.S. ——, 105 S.Ct. 93, 83 L.Ed.2d 39 (1984).

**16.** *See State Farm,* 463 U.S. at 40–44, 103 S.Ct. at 2863–67 (agency change of policy subject to review under the arbitrary and capricious standard); *Delmarva Power & Light Co. v. FERC,* 770 F.2d 1131, 1142 & n. 9 (D.C.Cir.1985) ("review of the reasonableness of an administrative adjudication includes consideration of the administrator's consistency in deciding similar cases.") (quoting *Dep't of Treasury v. FLRA,* 707 F.2d 574, 581 n. 25 (D.C.Cir.1983)); *Brae Corp. v. United States,* 740 F.2d 1023, 1038 (D.C.Cir.1984) ("agency must explain why the original reasons for adopting the rule or policy

product of impermissible considerations.[17] Because of the Commission's silence in this regard, we must remand this case to it for further explanation of its reasoning consistent with this opinion.

### III. THE WEIGHT AFFORDED TO THE POST-TERM EVIDENCE

Aside from its failure to comply with the technical dictates of *Rust*, the Commission's decision in this case also was deficient in that it failed to explain its departure from the underlying reasoning that gave rise not just to *Rust* but more generally to refusal by the agency to consider other kinds of post-term evidence. The Commission obviously attributed substantial weight to the station's post-term improvement; yet it never explained how this was consistent with its longstanding policy that a station's behavior when under strict Commission scrutiny is not very probative of the station's actual policies. Nor did the Commission address the common sense questions that arise in this context. For these reasons as well, we find it necessary to remand the case to the Commission for further articulation of its reasoning.

The Commission has long recognized that a licensee's upgrading during heightened Commission scrutiny must be severely discounted. *See Rust,* 73 F.C.C.2d at 51–54; *Walton Broadcasting, Inc.,* 78 F.C.C.2d

857, 876–7 (1980). Indeed, this skepticism about the probative value of last minute improvements is what gave rise to the *Rust* rule in the first place.[18]

The fact that the Commission has recognized the deficient nature of such evidence heightens the significance of its treatment of it here. But even had the Commission not based prior decisions on this fact, the Commission has a duty to address common sense questions about the manner with which it treats evidence. An agency has the duty to examine all "relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *State Farm,* 463 U.S. at 43, 103 S.Ct. at 2866 (quoting *Burlington Truck Lines, Inc. v. United States,* 371 U.S. 156, 168, 83 S.Ct. 239, 245, 9 L.Ed.2d 207 (1962)). It hardly takes an expert in human behavior to understand that people and companies tend to react a bit differently when they know they are being closely watched and that they have much to lose if they do not act properly. Yet the Commission never explained why it thought that WYEN would continue its so-recently improved ways once the heat was off. In short, the agency has failed to demonstrate that the factors it claims to have considered "could lead a reasonable person to make the judgment that the agency has

are no longer dispositive"), *cert. denied,* —— U.S. ——, 105 S.Ct. 2149, 85 L.Ed.2d 505 (1985); *Greater Boston Television Corp. v. FCC,* 444 F.2d 841, 851–52 (D.C.Cir.1970) (agency shifts in policy are "danger signals"), *cert. denied,* 403 U.S. 923, 91 S.Ct. 2229, 29 L.Ed.2d 701 (1971).

**17.** For example, an agency may not repudiate precedent simply to conform with a shifting political mood. Rather, the agency must demonstrate that its new policy is consistent with the mandate with which *Congress* has charged it. *Cf. International Ladies' Garment Workers' Union v. Donovan,* 722 F.2d 795, 828 (D.C.Cir. 1983) (agency may not justify shift in interpretation of statutory mandate simply by pointing to new political philosophies—even those implicitly endorsed by democratic decisionmaking), *cert. denied,* —— U.S. ——, 105 S.Ct. 93, 83 L.Ed.2d 39 (1984); *Office of Communication of the United Church of Christ v. FCC,* 707 F.2d 1413, 1443 (D.C.Cir.1983) (Congress, not the

Commission, is the more appropriate source of significant deregulation). While an agency may properly rely on an "incumbent administration's views of wise policy to *inform* its judgments," *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 2793, 81 L.Ed.2d 694 (1984) (emphasis added), it may not casually *substitute* those considerations for a rational evaluation of the merit and efficacy of its policies.

**18.** A station's behavior during an announced abeyance is even less probative than typical post-term behavior since an abeyance is formally announced and an applicant is *explicitly* told that its conduct is being monitored. As appellants put it, labeling improvements under these circumstances as meaningful "is akin to congratulating an ex-speeder for driving 55 miles per hour while surrounded on all sides by police cars each going 50 miles per hour." Appellant's Reply Brief at 10 n. 7.

made.'" *Telocator Network of America v. FCC,* 691 F.2d 525, 537 (D.C.Cir.1982) (quoting *NAACP v. FCC,* 682 F.2d 993, 998 (D.C.Cir.1982)).

 Another flaw in the Commission's decision was its failure to consider options other than a full seven-year renewal. One of the options that the FCC had used in dealing with WYEN in the past, was to impose heightened reporting requirements whereby it could keep a continuous close eye on the station. One might think that the station's improved record during the abeyance period would have demonstrated that heightened scrutiny was an effective tool to use with the station, and that some form of continued scrutiny should have been implemented.[19] Of course, there might be very reasonable explanations as to why this is not the case, but the Commission has done nothing to inform the court, the intervenors, or the public, what these reasons are. *Cf. Public Citizen v. Steed,* 733 F.2d 93, 104–05 (D.C.Cir.1984) (requiring agency to evaluate alternatives); *International Ladies' Garment Workers' Union v. Donovan,* 722 F.2d 795, 815–18 (D.C.Cir. 1983) (failure to consider alternatives is grounds for remand to agency), *cert. denied,* —— U.S. ——, 105 S.Ct. 93, 83 L.Ed.2d 39 (1984).

Finally, the lack of explanation is especially significant in this case because of the implications that the improved performance has on the earlier record of the station. WYEN has continuously claimed that its poor minority employment record was not due to a poor EEO program but rather to geographic and financial limitations. It argued that because of its distance from minority populated areas it was virtually impossible to attract minority employees. Moreover, it asserted that financial constraints made it impossible for it to compete for qualified minorities with the larger Chicago-based stations.

In its abeyance decision, the Commission expressed doubts about these defenses,[20] and a strong case can be made that, far from vindicating the station's record, the sudden improvement in hiring cast further doubt on the legitimacy of the defense. There is an obvious question of why, when the station's record was suddenly on the line, the geographic and financial issues could be overcome. Again, there might be myriad explanations for this change. But the Commission never even addressed the issue. Absent some idea of the Commission's reasoning process, we simply have no way of assessing whether the Commission analyzed or ignored these issues. While we would certainly exercise a great deal of deference to the agency's analysis, we will not exercise deference to an agency decision devoid of reasoning and analysis.

### CONCLUSION

 In granting WYEN a seven year license without any heightened reporting requirements, the FCC was not faithful to either the letter or the spirit of its prece-

---

**19.** The Commission did announce that it will "carefully review" the station's 1985 and 1986 Annual Employment Reports "to assure ourselves of the licensee's continued compliance." *Walt-West,* 98 F.C.C. at 850. We believe, however, that this promise to scrutinize the reports is a far cry from requiring special reports. As Commissioner Rivera explained, in dissent,

> [i]n order to assess WYEN's compliance with our EEO rules the Commission will have to examine not only the station's employment profile during the two week period during which EEO statistics are gathered for the Annual Employment Report, but also the thoroughness of its EEO program, in order to determine whether the station is continuing to make positive efforts to recruit, employ and promote qualified minorities. The majority's

response—instructing the staff to give "special scrutiny" to WYEN's Form 395—is, therefore, wholly inadequate under the circumstances. *Id.* at 853 n. 3. The Commission never explained why it believed that this mild promise of "careful review" was the best way to promote the "public interest."

**20.** It explained that "[w]hile licensee believes its suburban location and relative remoteness from public transportation are the main obstacles to obtaining applications from minorities, we are concerned that the lack of applications may be the result of the ineffectiveness of licensee's recruitment sources or a less than vigorous effort on the part of a licensee to keep these sources apprised of job openings at the station." *Chicago Renewals,* 89 F.C.C.2d at 1042.

dents. Because the agency failed to announce that it was departing from its prior policies or to justify its departure, we find it necessary to remand the case to the FCC. On the record before us, however, we find no justification for granting NBMC's request that we order the Commission to hold a hearing. *See Bilingual Bicultural Coalition on Media v. FCC*, 595 F.2d 621, 628–31 (D.C.Cir.1978) (en banc) (discussing agency discretion to choose manner and method of investigation). Evidence of statistical disparity is not, in and of itself, sufficient grounds for this court to order the FCC to conduct a hearing. *Id.* Upon reconsideration, the agency may take any action, including holding a hearing, that it deems appropriate, provided that it acts rationally and provides adequate explanations for its actions. In light of the lengthy delays already encountered in processing these renewals, we are accompanying our remand with instructions to the Commission that it inform us within 60 days of the mandate of its proposed schedule for promptly completing review of these applications. *See State Farm Mutual Automobile Insurance Co. v. Dep't of Transportation*, 680 F.2d 206, 240–41 (D.C. Cir.1982) (remanding and requiring agency to provide schedule of consideration), *aff'd in part and rev'd in part on other grounds sub nom. Motor Vehicle Manufacturers Association v. State Farm Mutual Automobile Insurance Co.*, 463 U.S. 29, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983); *cf. CPC International Inc. v. Train*, 515 F.2d 1032, 1051 (D.C.Cir.1975) (requiring EPA to reach decision and enter order within 120 days).

*It is so ordered.*

STARR, Circuit Judge, concurring:

While concurring in the court's judgment and opinion, I write separately to emphasize what this case does and does not involve. As the court's opinion states, the case is about the Commission's failure to follow past precedent, nothing more, nothing less. What the case does not involve is a challenge to the Commission's policies and regulations in the area of equal employment opportunity. *Compare Steele v. FCC*, 770 F.2d 1192 (D.C.Cir.1985); *Pappas v. FCC*, Nos. 85–1149, 85–1513 (D.C.Cir. petition for review filed Mar. 8, 1985). Indeed, the licensee steadfastly maintains that it has brought itself fully into conformity with the FCC's requirements and argues that the Commission, in granting a full seven-year period of renewal, faithfully applied its controlling precedent.

From my reading of this record, the fundamental deficiency in the licensee's discharge of its public trust is its marked failure year after year actively to recruit minorities, particularly blacks and Hispanics, into the applicant pool. There is no evidence, indeed no allegation, that the licensee engaged in any specific act of discrimination over the years. Rather, the licensee's failure to conform to the recruiting and outreach practices mandated by the Commission was, as I read this record, the direct cause of the dearth—indeed, for a period, a complete absence—of minorities in the licensee's workforce. Once WYEN at long last undertook a vigorous recruitment effort, the number of minority employees at the station took a significant turn upward.

The sole question before us is whether the Commission adhered to its controlling precedent in relying upon WYEN's eleventh-hour turnaround. For the reasons well stated for the court by Judge Wald, the answer to that question in this case must be an emphatic no.